**Joseph W. CASSIDY, et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

Nos. CS–93–19–JLQ, CR–92–194–JLQ.

United States District Court, E.D. Washington.

Jan. 27, 1994.

**1440**

Jerry K. Boyd, Paine, Hamblen, Brooke, Coffin & Miller, Spokane, WA, for plaintiffs.

James R. Shively, Asst. U.S. Atty., Spokane, WA, for defendants.

Alan C. Stay, Nespelem, WA, for amicus, Confederated Tribes of Colville Indian Reservation.

Jay Douglas Geck, Atty. Gen. of Washington, Olympia, WA, for amicus, State of Wash.

## ORDER DENYING THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT, **INTER ALIA**

QUACKENBUSH, Chief Judge.

**BEFORE THE COURT** is the Government's Motion to Dismiss for Failure to Join Indispensable Parties (Ct.Rec. 28, CS–93–19–JLQ), the Government's Motion for Summary Judgment (Ct.Rec. 32, CS–93–19–JLQ), the Government's Motion to Clarify and Supplement Record (Ct.Rec. 57, CS–93–19–JLQ), Plaintiffs' Motion to Strike and Expunge Portions of the Record or, in the Alternative, Motion to Compel Discovery (Ct.Rec. 60, CS–93–19–JLQ), and Joseph Cassidy's Renewal of Motion to Dismiss Information (Ct. Rec. 25, CR–92–194–JLQ), heard on November 15, 1993 and January 11, 1994. Jerry Boyd appeared on behalf of Plaintiffs; the Government was represented by Assistant United States Attorney James R. Shively. Having reviewed the record, heard from counsel, and being fully advised on this matter, the court rules for Plaintiffs.

At issue in this case is whether a non-Indian can be prosecuted under 18 U.S.C. § 1165 [1] for fishing on waters that have been

---

1. 18 U.S.C. § 1165 states:
"Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against

reserved for the "paramount," instead of the "exclusive," use of Indians. The court finds that a non-Indian cannot be so prosecuted.

## I. BACKGROUND

The relevant facts in this case are undisputed. The Colville Indian Reservation was created by Executive Order dated July 2, 1872, and the Spokane Indian Reservation was created by Executive Order dated January 18, 1881.

On August 30, 1935, Congress authorized the construction of Grand Coulee Dam on the Columbia River. Act of August 30, 1935 (49 Stat. 1028). In aid of the construction of the Grand Coulee Dam project, Congress granted to the United States all right, title, and interest of the Indians in and to the tribal and allotted lands within the Spokane and Colville Reservations as designated by the Secretary of Interior. Act of June 29, 1940, (54 Stat. 703), 16 U.S.C. § 835d. Congress further provided that:

> The Secretary of Interior, in lieu of reserving rights of hunting, fishing, and boating to the Indians in the areas granted under this Act [16 U.S.C. §§ 835d et seq.], shall set aside approximately one-quarter of the entire reservoir area for the paramount use of the Indians of the Spokane and Colville Reservations for hunting, fishing, and boating purposes, which rights shall be subject only to such reasonable regulations as the Secretary may prescribe for the protection and conservation of fish and wildlife.

16 U.S.C. § 835d.

After construction of the Grand Coulee Dam and the establishment of what is now Lake Roosevelt, the Grand Coulee Dam National Recreation Area, comprised of Lake Roosevelt and the surrounding area, were open for use by the general public. The general public had a right to fish and boat on the entire reservoir, subject to reasonable management by the National Park Service. From 1940 until the present, the State of Washington has regulated fishing by non-Indians on the entire reservoir.

In 1945, prior to the set-aside, the Solicitor for the Department of the Interior opined that 16 U.S.C. § 835d did not grant the Tribes an exclusive right to hunt and fish on the set-aside portion of Lake Roosevelt. In 1946, the Secretary of Interior established two zones on Lake Roosevelt for Indian use, known at the time as the Indian Zone. (Memorandum Agreement, Plaintiff's Exhibit 35.) This was done in compliance with Congress' directive in section 835d to set-aside one-quarter of the acquired land for the paramount use of the Tribes for hunting, fishing, and boating.

In 1974, the Solicitor for the Department of Interior rendered a contrary opinion, finding that the Indian tribes were entitled to exclusive occupancy of the land set aside pursuant to section 835d.[2] After this opinion was rendered, both the Colville and Spokane Tribes attempted to regulate fishing by non-Indians within the set-aside area. In 1982, the United States Attorney for the Eastern District of Washington assured the Tribes that non-Indians fishing within the Indian Zone would be prosecuted in federal court for trespassing.

In the Lake Roosevelt Cooperative Management Agreement ("Agreement"), executed on April 5, 1990, the Secretary of Interior reaffirmed the boundaries of the Indian Zone, which was the area of Lake Roosevelt allocated for Indian use in the 1946 Agree-

---

alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited."

**2.** The Solicitor's Opinion is based, in part, on a determination that section 835d merely shifted the Tribes' exclusive fishing rights from the flooded area of their Reservation land to the

Indian Zone created under the Act. Congress' use of the phrase "paramount use" clearly indicates that non-exclusive use of the set-aside area was contemplated by Congress. In fact, the Government even disagrees with the Solicitor's conclusion that the Tribes possess exclusive rights: "The United States is *not* asserting that [section 835d] established an "exclusive use" nor an "absolute and undisturbed use and occupancy" for the benefit of the Spokane and Colville Indians." (Defendants' Reply Brief at page 4.)

ment. Under the Agreement, the Grand Coulee Reservoir area was divided into three zones: (1) the Reclamation Zone; (2) the Recreation Zone; and (3) the Reservation Zone (previously known as the Indian Zone). The Agreement states that the Reclamation Zone is to be regulated by the Bureau of Reclamation, the Recreation Zone is to be regulated by the National Park Service, and the Reservation Zone is to be regulated by the Spokane and Colville Tribes. The Agreement grants to the Spokane Tribe the authority to manage, plan and regulate all activities within that portion of the Reservation Zone within the Spokane Reservation.

Under the authority delegated to them under the Agreement, the Spokane Tribe requires a permit for non-Indian fishing within the Spokane Reservation portion of the Reservation Zone. The Colville Tribes and the State of Washington have an agreement whereby the Colville Tribes allow non-Indians to fish in their portion of the Reservation Zone with a valid State of Washington fishing permit.

In June 1992, Joseph W. Cassidy fished on the northern half of the Spokane arm of Lake Roosevelt, which is located within a portion of the Reservation Zone allegedly under the regulatory control of the Spokane Tribe. (The Agreed Pretrial Order only states that he was fishing "on the waters of Lake Roosevelt;" however, it does not appear to be disputed that he was, in fact, fishing on the northern half of the Spokane Arm, which is within the Spokane Reservation.) At the time, Mr. Cassidy possessed a valid fishing license issued by the State of Washington, but he had not obtained a fishing permit from the Spokane Tribe.

In July 1992, an amended criminal information was filed against Mr. Cassidy in federal court. It was alleged therein that without lawful authority or permission, Mr. Cassidy fished upon lands belonging to the United States that were reserved for Indian use, in violation of 18 U.S.C. § 1165. Specifically, Mr. Cassidy was charged with fishing from the northern bank of the Spokane Arm of Lake Roosevelt without permission from the Spokane Tribe.

It was evident pretrial that resolution of the criminal case would require a legal determination as to who had regulatory jurisdiction over the Spokane Arm of Lake Roosevelt. Because the criminal action involved a purely legal question, the court stayed the criminal action so that Mr. Cassidy could seek a civil declaratory judgment regarding who had regulatory control over the Spokane Arm of Lake Roosevelt.

On January 21, 1993, Mr. Cassidy and Mr. Lee filed a complaint seeking both injunctive and declaratory relief. They filed an amended complaint on June 1, 1993. The Plaintiffs seek a declaration that the United States does not have jurisdiction under existing laws and regulations to regulate or prohibit fishing by non-Indians in any waters of Lake Roosevelt, so long as the individuals comply with the laws and regulations of the State of Washington. The Plaintiffs also ask the court to declare that it is not a violation of 18 U.S.C. § 1165 for non-Indians with valid Washington state fishing licenses to fish on Lake Roosevelt.

On June 3, 1993, the Plaintiffs filed a motion for default and, in the alternative, for a preliminary injunction. On June 17, 1993, the court entered an order denying the Plaintiff's motion. (Ct.Rec. 21, CS–93–19–JLQ.)

The Government filed a motion to dismiss on June 7, 1993, arguing that the court lacked jurisdiction over the Defendants in this case, based on the doctrine of sovereign immunity. Having found that sovereign immunity was waived in this case, the court entered an order on July 23, 1993 denying the Defendants' motion to dismiss.

The Defendants subsequently filed two additional motions, the resolution of which the parties agree will decide this case. First, the Defendants seek a dismissal based on a failure to join indispensable parties. In the alternative, the Defendants seek a judgment on the merits as a matter of law. Although the Plaintiffs have not formerly filed a cross-motion for summary judgment, the substance of their response brief can be reasonably construed as not only opposing the Defendants' motion, but also seeking judgment as a matter of law.

## II. DISCUSSION

The Defendants seek dismissal on the ground that an indispensable party has not been joined in this action. Specifically, it is argued that the Spokane and Colville Tribes are indispensable parties. Neither the Spokane nor the Colville Tribe is a party in this case;[3] however, the Colville Tribe has filed an amicus curiae brief. The Defendants alternatively argue that they are entitled to judgment as a matter of law and, therefore, summary judgment should be entered in their favor.

### A. Spokane and Colville Tribes as Indispensable Parties

Federal Rule of Civil Procedure 19 identifies "necessary" parties:

(a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Once a party is identified as a necessary party under Rule 19(a), there remains the question of whether the party is indispensable, thus requiring dismissal of the cause of action if the indispensable party is not joined.

(b) If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

Fed.R.Civ.P. 19(b). Rule 19(b) goes on to identify the factors which the court must consider in deciding whether a party is indispensable:

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

The court employs a two-step analysis under Rule 19. First, it must determine whether an absent party is "necessary" to the suit. Fed.R.Civ.P. 19(a). If so, and if that party cannot be joined, the court must assess whether the absentee party is " 'indispensable' so that in 'equity and good conscience' the suit should be dismissed." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990). "The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application. The moving party has the burden of persuasion in arguing for dismissal." *Id.* (citations omitted).

### 1. Necessary Party

The first issue is whether the Spokane and Colville Tribes are necessary parties to this action. To resolve this issue, the court must determine whether complete relief is possible among those already parties to the suit. *Lujan*, 928 F.2d at 1498. "This analysis is independent of the question whether relief is available to the absent party." *Makah*, 910 F.2d at 558. Even if complete relief is available among the existing parties, thus suggesting that the absent party may not be necessary, the court must still decide whether the absent party has a legally protected interest in the case. *Id.* This is because under Rule 19(a), a party is necessary if complete relief cannot be granted among the existing parties *or* the absent

---

**3.** It appears to be undisputed that the Tribes possess sovereign immunity and, therefore, cannot be joined in this action without their consent. *See Confederated Tribes of Chehalis Indian Reser-* *vation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991) ("Indian tribes ... are sovereign entities and are therefore immune from nonconsensual actions in state or federal court.").

party has a legally protected interest that might be impeded if the case proceeds in its absence. If a legally protected interest is found to exist, the issue becomes whether that interest would be impaired or impeded if the case were to proceed without the absentee party. *Id.* "Impairment may be minimized if the absent party is adequately represented in the suit. The United States may adequately represent an Indian tribe unless there is a conflict between the United States and the tribe." *Id.* Finally, the court must determine whether the risk of inconsistent rulings will affect the parties presently in the suit. *Id.* at 559.

The Plaintiffs seek no relief from the Tribes. Rather, they seek injunctive and declaratory relief against the United States, the United States Attorney, and the United States Marshal from prosecuting them for exercising their claimed right to fish in the Indian Zones of Lake Roosevelt with only a valid Washington fishing license. The Plaintiffs argue that complete relief between the existing parties is not only possible, but it is the only relief that is requested.

The Defendants note that resolution of this case will require an examination of 16 U.S.C. § 835d and the Agreement. Section 835d provides that in lieu of reserving hunting and fishing rights in the area acquired for construction of the Grand Coulee Dam, the Secretary of Interior shall set aside one-quarter of the entire reservoir area for the paramount use of the Indians of the Spokane and Colville Reservations for hunting, fishing and boating purposes, subject only to such reasonable regulations as the Secretary may prescribe for the protection and conservation of fish and wildlife. The Agreement allocates and delegates regulatory authority over portions of Lake Roosevelt between the federal government and the Spokane and Colville Tribes.

The Defendants contend that the Tribes' legally protected interest in this case is their right to control the use of the reserved land under the Agreement and their interest in their fishing rights granted under section 835d. The Defendants also argue that the Tribes have a legal interest here because they have an interest in enforcing the Agreement, *Lujan*, 928 F.2d at 1499, and because they have an "interest in preserving their own sovereign immunity, with its concomitant 'right not to have [their] legal duties judicially determined without consent.'" *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir.1992), *cert. denied*, ─── U.S. ───, 113 S.Ct. 2993, 125 L.Ed.2d 688 (1993).

The Plaintiffs argue that the issues in this case relate only to their civil rights, and not to any rights of the Tribes. They challenge the Defendants' position that the Tribes have an interest in fishing and hunting in the Reservation Zone that will be affected if the Plaintiffs prevail. The Plaintiffs label this contention "speculative," and argue that such speculation cannot be the basis of a finding that an absent party is necessary.

█ It is correct that mere speculation about a future event does not rise to the level of a legally protected interest. *Makah*, 910 F.2d at 558. However, the existence of an actual legal interest does not necessarily have to be established for the absent party to be considered "necessary." Pursuant to Rule 19, a finding that a party is necessary to an action is predicated only on that party having a *claim* to an interest. *See* Fed. R.Civ.P. 19(a)(2). "Just adjudication of claims requires that courts protect a party's right to be heard and to participate in adjudication of a claimed interest, even if the dispute is ultimately resolved to the detriment of that party." *Shermoen*, 982 F.2d at 1317.

█ Although the Plaintiffs' focus in this case is on the United States rather than the Tribes, it is clear that this case will turn on, among other things, the interpretation of section 835d and the Agreement. As stated in *Shermoen*, for a party to be "necessary," it is sufficient that it have a *claim* to an interest relating to the subject of the action. It is clear that the Tribes have at least a claim to a legally cognizable interest in this case because of the fishing and hunting rights arguably granted to them under section 835d, and the regulatory authority delegated to them under the Agreement. Further, like the tribes in *Shermoen*, the Tribes here have a protected interest in preserving their own sovereignty, with the concomitant right not

to have their legal duties adjudged without consent.

Having concluded that the Tribes possess a claim to an interest, the issue becomes whether that interest will be impaired or impeded by the suit. Given the interest possessed by the absentee Tribes, if the court were to grant the requested relief— that is, enjoining the Defendants from prosecuting individuals who fish in the Reservation Zone without permission from the Tribes, the Tribes' fishing rights arguably created by section 835d and their regulatory authority under the Agreement, would be impaired or impeded. However, this does not necessarily mandate a finding that the Tribes are necessary parties.

As stated above, in some cases the prejudice created by a party's absence is mitigated, or even eliminated, by the presence of a party who will represent the absent party's interest. *Makah,* 910 F.2d at 558. "The United States may adequately represent an Indian tribe unless there is a conflict between the United States and the tribe." *Id.*[4]

In this case, the Plaintiffs have failed to allege any reason why the United States would not adequately represent the Tribes, nor is there any apparent actual or potential conflict between the United States' interests and those of the Tribes. It appears that both the United States and the Tribes, if parties, would have the court construe section 835d and the Agreement in essentially the same fashion. Both appear to agree that section 835d directed the Secretary of Interior to set aside one-quarter of Lake Roosevelt for the paramount use of the Spokane and Colville Tribes for hunting, fishing, and boating, and that such land was subject to reasonable regulations as the Secretary of Interior may prescribe for the protection of fish and wildlife.

■ The position of the United States that section 835d reserved in the Tribes fishing and hunting rights in the Reservation Zone does not appear to be inconsistent with the likely position of the Tribes. Further, the United States appears to take a position regarding the Agreement which is not in conflict with the Tribes. In the Agreement, the United States purports to delegate to the Tribes regulatory control over the Reservation Zone. It is pursuant to this delegated regulatory control that the Spokane Tribe has regulated non-Indian fishing in its portion of the Reservation Zone. It appears both the Tribes and the United States have the same desire to see the Agreement remain in full force and effect. Further, the United States can adequately represent the Tribes' interest without compromising any obligation it may have to the Plaintiffs or to other Indian tribes. This finding is contrary to that in *Lujan,* 928 F.2d at 1500 (United States could not adequately represent the absentee tribe's interest without compromising the trust obligations owed to the plaintiff tribes) and *Makah,* 910 F.2d at 560 (potential intertribal conflicts means the United States cannot properly represent any of the tribes).

In sum, the absentee Tribes have a claim to an interest in the subject matter of this action. However, they are not "necessary" parties because their interests are adequately represented by an existing party to this case, the United States. Because the United States is a party to this action, disposition of this case in the absence of the Tribes, as a practical matter, will not impede or impair the Tribes' ability to protect their interest. Therefore, the court finds that the Tribes are not necessary parties under Rule 19(a).

### 2. *Indispensable Party*

■ "Only if the absent parties are 'necessary' and cannot be joined must the court determine whether in 'equity and good conscience' the case should be dismissed under Fed.R.Civ.P. 19(b)." *Makah,* 910 F.2d at 559. Having concluded that the Tribes are not "necessary" parties under Rule 19(a), they cannot be indispensable parties under

---

**4.** The fact that the Tribes could intervene, but have chosen not to, is not a factor that necessarily lessens the prejudice they might suffer if this case were resolved in their absence. In *Lujan,* it was argued that the absentee tribe could minimize the potential prejudice by intervening in the action and asserting its interests. However, citing *Makah,* the court held that "the ability to intervene if it requires waiver of immunity is not a factor that lessens prejudice." *Lujan,* 928 F.2d at 1500 (citing *Makah,* 910 F.2d at 560).

Rule 19(b). Therefore, the Defendants' motion to dismiss based on a failure to join indispensable parties should be denied.

### B. *Summary Judgment Standard*

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Zweig v. Hearst Corp.,* 521 F.2d 1129 (9th Cir.1975), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in favor of the nonmoving party, there are no genuine issues of material fact in dispute, and they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Semegen v. Weidner,* 780 F.2d 727 (9th Cir.1985). However, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang,* 711 F.2d 141 (9th Cir.1983).

▮▮▮▮ When evaluating evidence offered to resist summary judgment, the Ninth Circuit distinguishes between direct and circumstantial evidence. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). Where the nonmoving party has come forward with direct evidence contrary to that offered by the movant, a credibility issue is raised. Credibility determinations are for the trier of fact and, therefore, not appropriately resolved by summary judgment. *McLaughlin v. Liu,* 849 F.2d 1205, 1207 (9th Cir.1988). Where direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *T.W. Elec.,* 809 F.2d at 631–32. However, when the only evidence offered in opposition to the motion for summary judgment is circumstantial evidence, then the court may inquire into the plausibility of inferences drawn from that evidence. *Id.*

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determination of whether a fact is material; (2) determination of whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) consideration of that evidence in light of the appropriate standard of proof. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510.

Disputes concerning material facts also must be genuine. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Although the court construes all facts and draws all inferences in favor of the nonmoving party, "the record must be sufficient to let a rational factfinder find that the inference nonmovant suggests is more likely than not true. A mere scintilla of evidence isn't enough." *Scott v. Henrich,* 978 F.2d 481, 485 (9th Cir.1992) (citation omitted).

A party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In order to survive a supported motion for summary judgment, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). In other words, once the moving party has met its burden, the party opposing the motion may not rest upon the allegations or denials contained in his pleadings. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. "When determining if a genuine factual issue ... exists, ... a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability...." *Id.* at 254, 106 S.Ct. at 2513. This necessitates application of the substantive evidentiary standard of proof that would apply at the trial on the merits. *Id.* at 252, 106 S.Ct. at 2512. "Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513. The question is, therefore, "whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not." *Id.* The standard that governs the trial judge's determination as to whether a genuine issue exists is provided by the applicable evidentiary standards. *Id.* at 255, 106 S.Ct. at 2513–14. This being a civil case, the applicable evidentiary standard is a preponderance of the evidence.

## C. *Regulatory Authority Over the Reservation Zone*

There are two central issues here: (1) whether section 835d reserved in the Tribes regulatory control over the Reservation Zone, including the authority to regulate fishing, and (2) whether the United States has authority to regulate fishing in the Reservation Zone, and, if the United States has such authority, whether the United States' purported delegation of that authority to the Tribes was proper. If section 835d does not grant the Tribes regulatory authority, and if the Tribes do not possess delegated authority from the United States, then Mr. Cassidy did not violate section 1165 because he was not fishing "unlawfully."

Section 1165 prohibits, among other things, an individual from *unlawfully* fishing on land reserved for Indian use. Here, Mr. Cassidy's alleged "unlawful" conduct was a failure to get a tribal fishing permit. If the Spokane Tribe does not have the authority to require such a permit, pursuant to either section 835d or a delegation from the United States, an essential element of section 1165 is absent. However, if the Spokane Tribe possesses regulatory power, then Mr. Cassidy's failure to obtain a tribal fishing permit rendered his fishing in the Reservation Zone "unlawful." If the court were then to find that the Reservation Zone is land "reserved for Indian use," Mr. Cassidy's unlawful fishing within the Reservation Zone was in violation of section 1165.

### 1. *Reserved Regulatory Authority*

It is undisputed that pursuant to the Act of 1940, codified at 16 U.S.C. § 835d, the United States acquired all right, title, and interest of the Tribes in the Spokane and Colville Reservations underlying Lake Roosevelt.[5] The purpose of this acquisition was for the construction, operation, and maintenance of the Columbia Basin Project. However, Congress also provided that in lieu of reserving rights of hunting, fishing, and boating to the Tribes, the Secretary of Interior shall set aside approximately one-quarter of the entire reservoir for the paramount use of the Tribes for hunting, fishing, and boating purposes. 16 U.S.C. § 835d. These rights were made subject only to such reasonable regulations as the Secretary of Interior prescribed for the protection and conservation of fish and wildlife. *Id.*

The Plaintiffs claim that Congress only granted limited authority to the Secretary of Interior to authorize Indian fishing, hunting, and boating in the Reservation Zone. They argue that Congress did not set-aside the Reservation Zone for the exclusive use of the Tribes. Rather, the Plaintiffs argue that the State of Washington has the exclusive right to regulate non-Indian fishing in the Reservation Zone. The Defendants agree that the Tribes do not have exclusive control over the Reservation Zone or an exclusive right to

---

5. The Plaintiffs, however, argue that under the equal-footing doctrine, the State of Washington retains ownership of the lands underlying the original navigable portion of the Columbia and Spokane Rivers. Whether the application of the equal-footing doctrine in this case affects the regulatory control of the Reservation Zone will be discussed *infra.*

fish therein. It is the Defendants' position that section 835d demonstrates Congress' intent to make special provisions for Indian fishing in the Reservation Zone, and thus Congress effectively reserved lands belonging to the United States for the Tribes to use for fishing, hunting, and boating purposes. Because of this reservation, the Defendants argue that the Tribes have a right to regulate hunting, fishing, and boating in the Reservation Zone.

An issue somewhat similar to the one in the case at bar was recently addressed by the Supreme Court in *South Dakota v. Bourland*, —— U.S. ——, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). The Fort Laramie Treaty established the Great Sioux Reservation in 1868. The Reservation was to be held for the "absolute and undisturbed use and occupation" of Sioux Tribes. Further, no non-Indians, other than authorized government agents, could "pass over, settle upon, or reside in" the Great Sioux Reservation. The Great Sioux Reservation was eventually broken into smaller reservations, including the Cheyenne River Reservation.

Pursuant to the Flood Control Act of 1944, a comprehensive flood control plan was established along the Missouri River. The Flood Control Act also directed the Army Chief of Engineers to construct, maintain, and operate public park and recreational facilities in reservoir areas, which were to be open to the general public, subject to federal regulation. Subsequent Acts of Congress authorized limited takings of Indian lands for dams along the Missouri River. One such acquisition involved the Oahe Dam and Reservoir Project, for which the Congress required the Cheyenne River Sioux Tribe to relinquish 104,200 acres of its reservation land. Although the tribe conveyed all of its interest in the 104,200 acres, the Act reserved certain rights to the Tribe, including the right to have "without cost, the right of

free *access* to the shoreline of the reservoir including the *right* to hunt and fish in and on the aforesaid shoreline and reservoir, *subject, however, to regulations governing the corresponding use by other citizens of the United States.*" *Id.* at ——, 113 S.Ct. at 2314 (quoting Cheyenne River Act of 1954, 68 Stat. 1191, 1193).[6]

In its complaint, South Dakota sought to enjoin the Tribe from excluding non-Indians from hunting on non-trust land within the reservation. In the alternative, South Dakota sought a declaration that the federal takings of the tribal lands for the Oahe Dam and Reservoir had reduced the Tribe's authority by withdrawing these lands from the reservation.

The Court initially noted that because the tribes originally possessed the unqualified right of "absolute and undisturbed use and occupation" of the reservation land, the tribes had "both the greater power to exclude non-Indians from, and arguably the lesser-included, incidental power to regulate non-Indian use of, the lands later taken for the Oahe Dam and Reservoir Project." *Id.* at ——, 113 S.Ct. at 2316. Under the prior rulings in *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) and *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), the Court held that when tribal lands are conveyed to non-Indians, the tribes lose any former right of absolute and exclusive use and occupation of the conveyed lands. *Bourland*, —— U.S. at ——, 113 S.Ct. at 2316. "The abrogation of this greater right, at least in the context of the type of area at issue in this case, implies the loss of regulatory jurisdiction over the use of the land by others." *Id.* (footnote omitted).

---

**6.** The Defendants distinguish *Bourland* on the basis that there was no specific "set-aside" for the tribes in *Bourland*. Interestingly, in *Bourland*, the tribe had a free right of access to the entire reservoir and shoreline for hunting and fishing, not just one-quarter of the area, as is the case here.

There is no question that the Tribes do not possess any regulatory control over the three-

quarters of Lake Roosevelt that was not set-aside. That portion of the lake is not relevant here. Only the one-quarter set aside by the Secretary is. The proper comparison, therefore, is between the one-quarter portion of Lake Roosevelt set-aside for the Tribes, and the entire Oahe Reservoir.

When Congress took the tribe's land for the Oahe Dam project, it broadly opened the land and reservoir up for public use. Because Congress provided that the acquired land was to be generally accessible to the public, the Court found that the tribe lost its ability to exclude non-Indians from the acquired lands, "and with that the incidental regulatory jurisdiction formerly enjoyed by the Tribe." *Id.* at ———— ————, 113 S.Ct. at 2316–17.

The Court noted that the Act acquiring the tribe's land for the dam and reservoir preserved certain land-use rights in the tribe, notably mineral, timber, and grazing rights. The Court of Appeals treated these retained rights as evidence that the taking was not a simple conveyance of land and, therefore, it concluded that Congress had not abrogated the tribe's regulatory authority. The Supreme Court disagreed, holding that "Congress' explicit reservation of certain rights in the taken area does not operate as an implicit reservation of all former rights." *Id.* at ————, 113 S.Ct. at 2318. The Court simply could not explain Congress' decision to grant the tribe the right to hunt and fish in the reservoir area except as an indication that Congress intended to divest the tribe of its right to "absolute and undisturbed use and occupation" of the taken area. "When Congress reserves limited rights to a tribe or its members, the very presence of such a limited reservation of rights suggests that the Indians would otherwise be treated like the public at large." *Id.* at ————, 113 S.Ct. at 2319.

■■■ It was the exclusive language of the treaties in *Bourland* and *Montana* that led the Supreme Court to conclude that prior to the federal land acquisition, the tribes had an implicit right to exclude non-members from tribal reservation land and, therefore, an arguable right to regulate fishing and hunting on those lands. Here, it is undisputed that the Executive Orders creating the Colville and Spokane Reservations did not contain the type of exclusionary language referred to by the Court in *Bourland* and *Montana*.[7] In the absence of treaty provisions or congres-

sional pronouncements to the contrary, however, "the tribe has the inherent power to exclude non-members from the reservation." *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 410 (9th Cir.1976) (citing *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)). Thus, it would appear that like the Cheyenne Tribe in *Bourland*, the Spokane and Colville Tribes possessed the inherent power to exclude non-members from all their reservation land, including what was later acquired under the Act of 1940. This implicit power to exclude arguably conferred upon the Tribes the authority to control the fishing and hunting on those lands prior to the Act of 1940. However, as to the land in question, this regulatory power was lost when the United States acquired the land under Lake Roosevelt for the purpose of constructing and maintaining Grand Coulee Dam and the resulting reservoir.

In *Bourland*, the United States acquired all interest in the land used for the construction of the Oahe Dam and Reservoir pursuant to the Cheyenne River Act. Similarly, all title and interest previously possessed by the Tribes in the Grand Coulee Dam basin was acquired pursuant the Act of 1940. Both cases involve a dispute as to whether dispossessed tribes can regulate hunting and fishing on federal land that was acquired by the United States for the construction and maintenance of dams and was previously part of the tribes' respective reservations. The principal distinction between this case and *Bourland* is that here, the Tribes were provided with a paramount use of one-quarter of the reservoir created on the acquired land for fishing, hunting, and boating. In *Bourland*, the tribe was provided free access to the reservoir area to hunt and fish, along with the general public. It was this general "opening up" that negated any regulatory control the tribe may have previously had over the area. The question is, therefore, whether the Act of 1940 sufficiently "opened up" the area acquired under the Act so that the Tribes' regulatory control was lost.

---

7. No reference or statement was made in the Executive Order establishing the Colville Reservation that the area was for the exclusive use of the Confederated Tribes of the Colville Indian Reservation. Similarly, the Executive Order establishing the Spokane Reservation made no reference of exclusive use or occupancy by the Spokane Tribe. (Ct.Rec. 56, ¶ 21 and ¶ 24.)

The Defendants' argument that this case is distinguishable from *Bourland* hinges on two things.[8] First, when Congress directed the Secretary of Interior to set-aside one-quarter of the reservoir area for the "paramount use" of the Tribes to hunt, fish, and boat, it effectively "reserved" those lands for the Tribes. Second, although the Reservation Zone is open to the public in a general sense, when it comes to fishing, hunting, and boating, Congress' implied reservation rendered the Reservation Zone "closed" for those limited purposes, thus enabling the Tribes to maintain their regulatory control over hunting, fishing, and boating in the Reservation Zone.

It is agreed that the Tribes do not have the exclusive right to fish, hunt, and boat in the Reservation Zone. This stems from Congress' grant of only a "paramount right" to use, rather than an exclusive right. The parties' views diverge when it comes to the interpretation of the term "paramount." The Plaintiffs contend that Congress' use of the word "paramount" implies only that the Tribes have a superior, protected interest in the designated activities. They disagree with the Defendants' position that paramount use impliedly means that the Tribes have a reserved right to fish, which in turn precludes a finding that the Reservation Zone is "open" to the general public in the same sense as the reservoir was in *Bourland*.

Resolution of this issue must begin with an examination of the statute. *Bread Political Action Committee v. Federal Election Com.*, 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982). At the outset, the court is mindful that "[c]onsiderable deference is due an agency's interpretation and application of a statute it administers." *Monet v. Immigration and Naturalization Service*, 791 F.2d 752, 753 (9th Cir.1986). Nevertheless courts "must not 'rubber-stamp ... ad-

ministrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *N.L.R.B. v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)).

To begin with, the court must construe the term "paramount." "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Because the term "paramount" is not defined in section 835d, the court looks to the contemporary meaning for guidance. "Paramount" is defined as "highest in rank or jurisdiction; chief; pre-eminent; supreme." *Webster's New Collegiate Dictionary*, G. & C. Merriam Co. (2d. ed. 1959).

It is clear that by using the term "paramount," Congress intended that the Tribes be accorded more than just equal access to the Reservation Zone for fishing, hunting, and boating. Rather, the Tribes' access to the Reservation Zone for the designated purposes was to be chief among all users of the area. Congress' intent to accord the Tribes' supreme access to the Reservation Zone for hunting and fishing is further illustrated by its command that the Tribes' right of access be subject only to reasonable regulations implemented by the Secretary of Interior to protect and conserve fish and wildlife. Given the definition of paramount, it is apparent that Congress did not necessarily intend for the Tribes to have exclusive use of the Reservation Zone for the stated purposes.[9] The statute plainly anticipates

8. The Defendants claim that the issue here is not whether the Tribes can regulate hunting and fishing within the Reservation Zone, but whether non-Indians need to get the Tribes' permission before hunting or fishing in the Reservation Zone. The Defendants assert that this distinction makes this case distinguishable from *Bourland*. This is a distinction without a difference. If the Tribes require a non-Indian to obtain permission before hunting or fishing in the Reservation Zone, they are "regulating" that area in the same

sense as the tribe was attempting to regulate non-Indians in *Bourland*.

9. This is not to say that the Secretary could not grant the Tribes exclusive access to fish, hunt, and boat if such a restriction were necessary to protect the Tribes' ability to engage in those activities. The relevant inquiry here, however, is whether Congress reserved an exclusive right in the Tribes to fish, hunt, and boat in the Reservation Zone. The court holds that it did not.

that the Tribes are to use the Reservation Zone in connection with other users. But it is also clear that Congress intended that out of all user groups, the Tribes' use was to be "paramount" or, in other words, of the highest rank.

The court need go no further than the plain language of the statute itself to see that Congress must have intended "paramount use" to mean something other than a reservation of an exclusive right. Congress specifically stated that the Tribes' paramount use of the Reservation Zone for fishing, hunting, and boating was "in lieu" of reserving those same rights in the land acquired under the Act. If the court were to construe the phrase "paramount use" as meaning a reservation of an exclusive right, then the "in lieu of" portion of section 835d would be rendered meaningless.

Moreover, even if section 835d were construed as reserving a right to hunt and fish in the Reservation Zone, it would not necessarily follow that the Tribes would have authority to regulate non-Indians in that area. As the Supreme Court noted, the explicit reservation of certain rights does not operate as an implicit reservation of all former rights. *Bourland*, —— U.S. at ——, 113 S.Ct. at 2318. "[W]hen Congress reserves limited rights to a tribe or its members, the very presence of such a limited reservation of rights suggests that the Indians would otherwise be treated like the public at large." *Id.* at ——, 113 S.Ct. at 2319.

As can be seen, there is a difference in the degree to which the Reservation Zone and the Oahe Dam Reservoir were opened to the public. However, the Reservation Zone of Lake Roosevelt, like the Oahe Dam Reservoir was "broadly opened" for public use. It is clear that the general public can enter the Reservation Zone and engage in hunting, fishing, and boating along side the Tribes.[10] The distinction is that the Tribes' right to

fish, hunt, and boat in the Reservation Zone is superior to the right of the general public to engage in those activities. Thus, if the two begin to conflict, the Secretary of Interior could implement regulations restricting the public's access so that the Tribes' ability to engage in the designated activities would not be hindered.[11] Although this factor somewhat distinguishes this case from *Bourland*, it does not mandate a different result.

It is undisputed that the Reservation Zone is open to the public for activities other than hunting, fishing, and boating. The Defendants, for example, do not appear to suggest that the Tribes can regulate timber harvesting or mining in the Reservation Zone under section 835d. The Defendants' argument focuses only on the three activities specified in section 835d. Therefore, even assuming that the Reservation Zone is somewhat more closed than the Oahe Dam Reservoir because of the possibility that the Secretary of Interior could impose restrictions on the general public's use to protect the Tribes' paramount use, the Reservation Zone is still broadly opened to the public in the sense that it is not set aside for the Tribes' paramount use with respect to any activities other than fishing, hunting, and boating as specifically mentioned in section 835d.

In *Bourland*, the Supreme Court noted that the Cheyenne River Act granted to the tribe a free right of access to the shoreline of the reservoir, including the right to hunt and fish, subject to regulations governing corresponding use by other citizens of the United States. The Court then held that if "Congress had intended by this provision to grant the Tribe the additional right to regulate hunting and fishing, it would have done so by a similarly explicit statutory command." *Bourland*, —— U.S. at ——, 113 S.Ct. at 2317. Similarly, in the case *sub judice*, the Act of 1940 set aside one-quarter of the acquired land for the paramount use of the

---

**10.** Congress expressly directed the Secretary of the Interior to dedicate portions of the land acquired to construct and maintain the Grand Coulee Dam and Lake Roosevelt for public purposes. 16 U.S.C. § 835c.

**11.** The Defendants point out that the Secretary of the Interior can only regulate the Tribes' ability

to fish, hunt, and boat in order to protect fish and wildlife. However, this fact does not favor the Defendants' position that the Reservation Zone is "closed." It is but a further indication that Congress did not intend to infringe upon the Tribes' ability to engage in the designated activities.

Tribes for fishing, hunting, and boating, subject only to regulations designed to protect fish and wildlife. If Congress had intended to allow the Tribes to regulate hunting and fishing in the Reservation Zone, it could have expressly so provided in the statute.

 In sum, by enacting section 835d, Congress broadly opened the Reservation Zone to the general public. The Tribes, which arguably had regulatory control over the land under the Reservation Zone prior to its acquisition by the United States, lost this control when Congress acquired the lands underlying Lake Roosevelt. As the Supreme Court has held: "Certainly, the power to regulate is of diminished practical use if it does not include the power to exclude: regulatory authority goes hand in hand with the power to exclude." *Bourland*, —— U.S. at —— n. 11, 113 S.Ct. at 2317 n. 11. Although the Reservation Zone is clearly to be maintained for the paramount use of the Tribes for hunting, fishing, and boating, the fact is that the statute does not preclude the general public from engaging in those same activities in the Reservation Zone, as well as the entire lake. To hold that the Tribes possess some sort of exclusive right would be to render the term "paramount" meaningless, or interpret "paramount" to mean "exclusive." Accordingly, under *Bourland*, the court finds that when Congress acquired the Reservation Zone, the Tribes lost their inherent right of absolute and exclusive use and occupation of the area. "The abrogation of this greater right ... implies the loss of regulatory jurisdiction over the use of the land by others." *Bourland*, —— U.S. at ——, 113 S.Ct. at 2316.

### 2. Regulatory Authority Delegated by the United States

 Having concluded that the Tribes' regulatory control over the Reservation Zone was terminated when the United States acquired the area pursuant to the Act of 1940, the issue then becomes whether the United States properly delegated regulatory control to the Tribes. The Plaintiffs argue that the State of Washington has the *exclusive* authority to regulate hunting and fishing on Lake Roosevelt. Therefore, they argue, the United States had no authority to delegate such authority to the Tribes. The court finds that the State of Washington does not have *exclusive* authority to regulate hunting and fishing on Lake Roosevelt.

It is agreed that the Columbia River was and is a navigable waterway. The parties agree that the State of Washington was admitted to the Union on equal footing with the other states, and, as part of its sovereignty, the State of Washington acquired all of the soils under navigable waters when it became a state. The Plaintiffs assert that the State of Washington also acquired the right to regulate non-Indians on those waters. The Defendants do not appear to disagree that Washington has some interest in the original bed and banks of the Columbia and Spokane Rivers, but they argue that this interest does not prohibit the United States from exercising regulatory control over Lake Roosevelt.

 The Plaintiffs' argument rests on the equal-footing doctrine. The equal-footing doctrine provides that new states enter the Union on an equal footing with the original states, all of which entered the Union owning the land under navigable water within their borders. *Confederated Salish & Kootenai Tribes of Flathead Reservation v. Namen*, 665 F.2d 951, 961 n. 27 (9th Cir.1982).

Through the Constitution, the original states granted the federal government the right to regulate interstate and foreign commerce, thereby giving Congress an expansive right to ensure the navigability of waterways, but the states reserved title to the beds of their navigable waters. Under the equal footing doctrine, as a general principle, new states took title to and trusteeship for the lands under the navigable waters within their borders as an incident of sovereignty upon admission to the Union.

*District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1082 (D.C.Cir.1984) (footnotes omitted). Although the State of Washington arguably continues to have some interest in the original bed and banks of the Columbia River and the portions of the Spokane River which were navigable when Washington entered the Union, this does not give it the

exclusive right to regulate non-Indian hunting and fishing on Lake Roosevelt.

When referring to the interest of a riparian owner in the submerged lands in front of his upland bounding on a public navigable waterway, the Supreme Court has held that he possess "a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation." *United States v. Chandler–Dunbar Water Power Co.*, 229 U.S. 53, 64, 33 S.Ct. 667, 672, 57 L.Ed. 1063 (1913). The Court also has held that the equal-footing doctrine "cannot be accepted as limiting the broad powers of the United States to regulate navigable waters under the Commerce Clause and to regulate government lands under Art. IV, § 3, of the Constitution." *Arizona v. California*, 373 U.S. 546, 597–98, 83 S.Ct. 1468, 1496, 10 L.Ed.2d 542 (1963). Thus, even if the State of Washington has an interest in the original beds and banks of the Columbia and Spokane Rivers, such an interest does not give it the right to regulate Lake Roosevelt to the exclusion of the federal government.

■■■ Pursuant to Article IV, section 3, of the Constitution, Congress has the power to dispose of and make all needful rules and regulations respecting property of the United States. "Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause." *Kleppe v. New Mexico*, 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34 (1976). Indeed, it is the Property Clause that provides the basis for the federal government to govern the territories of the United States. *Id.* The federal government's supervisory role over the property of the United States has been characterized as a "complete power" over public lands. *Id.* This complete power "necessarily includes the power to regulate and protect the wildlife living there." *Id.* at 540–41, 96 S.Ct. at 2292.

Congress expressly authorized the Secretary of Interior to administer the public lands acquired for the construction of the Grand Coulee Dam and resulting reservoir. 16 U.S.C. § 835c. Section 835h authorizes the Secretary of Interior to prescribe such regulations as he may deem appropriate to carry out the provisions of the Act (16 U.S.C. §§ 835d *et seq.*) In addition, Congress specifically stated that the Secretary had the authority to implement regulations to protect fish and wildlife. 16 U.S.C. § 835d. Congress also provided that the Secretary of Interior's functions, powers, and duties could be performed, exercised, or discharged "by his duly authorized representative." 16 U.S.C. § 835c-4.

The legislation that acquired the area in dispute (16 U.S.C. §§ 835 *et seq.*) does not specifically state that the Secretary has regulatory authority over hunting and fishing in the set-aside area, referred to herein as the Reservation Zone. However, it does provide the Secretary with broad authority to implement regulations to protect project lands and facilitate project development. Under this broad authority, the Secretary of Interior has the authority to regulate hunting and fishing on Lake Roosevelt, including the Reservation Zone. Further, section 835d itself grants the Secretary regulatory power over both Indians and non-Indians in the waters of the Reservation Zone.

Pursuant to section 835d, the Secretary of Interior has the authority to implement regulations to protect fish and wildlife. Congress granted the Secretary this authority after stating that the Tribes had a paramount right to fish, hunt, and boat in the Reservation Zone. Specifically, Congress stated that "the Secretary ... shall set aside approximately one-quarter of the entire reservoir area for the paramount use of the [Tribes] ... for hunting, fishing, and boating purposes, which rights shall be subject only to such reasonable regulations as the Secretary may prescribe for the protection and conservation of fish and wildlife." 16 U.S.C. § 835d. The Plaintiffs argue that under this section, the Secretary is only allowed to regulate the *Tribes* in the Reservation Zone. However, at page 18 of their opposition memorandum, they acknowledge that there may be some instances when the Secretary

could regulate non-Indians pursuant to section 835d.

 It would be a strained construction of section 835d to allow the Secretary to regulate only Indian hunting and fishing in the Reservation Zone. Implicit in the Secretary's directive to regulate hunting and fishing to preserve and protect wildlife against Indian use is a command to engage in the same regulation of non-Indian uses. It was the Tribes to whom Congress granted a "paramount" right to hunt and fish in the Reservation Zone. It would push the bounds of reason to conclude that the Secretary could only regulate the class possessing the right of superior use, while being unable to regulate other user groups. Having concluded that Congress granted the Secretary of Interior authority to regulate both Indian and non-Indian hunting and fishing in the Reservation Zone, the court must determine whether the Secretary of Interior properly delegated this authority to the Tribes.

During the preliminary injunction hearing, this court framed the delegation issue as follows: Does the Lake Roosevelt Cooperative Management Agreement ("Agreement") delegate to the Tribes the authority to regulate hunting and fishing in the Reservation Zone, and, if it does, is it a valid delegation of authority?

The Agreement, in pertinent part, provides:

> The Spokane [and Colville] Tribe[s] shall manage, plan and regulate all activities, development, and uses that take place within that portion of the Reservation Zone within the Spokane [and Colville] Reservation in accordance with applicable provisions of federal and tribal law, and subject to the statutory authorities of Reclamation, and consistent with the provisions of this Agreement subject to Reclamation's right to make use of such areas of the Reservation Zone as required to carry out the purposes of the Columbia Basin Project.

Lake Roosevelt Cooperative Management Agreement, ¶ IV.D.3. (pages 5–6). Subject to a few specific exceptions, the Agreement delegates to the Tribes the authority to regulate *all activities* within the Reservation Zone. The Tribes' regulatory authority is subject to Reclamation's statutory authority and Reclamation's right to use the Reservation Zone to carry out the purposes of the Columbia Basin Project. The Tribes' regulations must also be consistent with federal and tribal law and the provisions of the Agreement.

A regulation requiring non-Indians to obtain a permit before fishing in the Reservation Zone is clearly action which could be taken by the Government. It is not one that conflicts with the provisions of the Agreement or federal or tribal law, nor does it interfere with the Reclamation's statutory responsibility to carry out the purposes of the Columbia Basin Project. Thus, if the delegation was proper, it would appear that the Tribes can regulate fishing and hunting in the Reservation Zone.

Section 835c–4 provides that "[w]herever in this Act functions, powers, or duties are conferred upon the Secretary, said functions, powers, or duties may be performed, exercised, or discharged by his *duly authorized representatives*." (Emphasis added.) One could argue that through the Agreement, the Secretary has made the Tribes his "duly authorized representative" with respect to regulatory control over the Reservation Zone.

As mentioned above, section 835d grants the Secretary authority to regulate hunting and fishing in the Reservation Zone to protect fish and wildlife. Although the Plaintiffs contend that this authority to regulate runs only against the Tribes, the court finds that it gives the Secretary authority to regulate all users of the Reservation Zone, including non-Indians. It could be argued that pursuant to sections 835c–4 and 835d, the Tribes are the Secretary's "representatives" and, therefore, it was proper for the Secretary to "duly authorize" the Tribes to regulate hunting, fishing, and boating in the Reservation Zone.

### D. *Applicability of 18 U.S.C. § 1165*

The focus of the criminal case is slightly different than the civil case. In the criminal

case, the issue is whether 18 U.S.C. § 1165 was violated. That section provides:

> Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

18 U.S.C. § 1165.

This section is applicable here only if the Reservation Zone has been "reserved for Indian use" for the purpose of hunting, fishing, or trapping. If "reserved for Indian use" requires that the land be reserved exclusively for Indian hunting, fishing, and boating, it is clear that the statute is inapplicable here. As discussed above, Congress granted the Tribes a paramount right, not an exclusive one.

▮ Additionally, the statute is inapplicable if Mr. Cassidy did not unlawfully enter the Reservation Zone and fish. As discussed above, the Tribes do not possess the authority to regulate fishing, hunting, or boating in the Reservation Zone under section 835d. Because one of the elements of section 1165 is unlawful or non-permissive entry upon land reserved for Indian use for hunting or fishing, if Mr. Cassidy did not need the Spokane Tribe's permission to fish in the area, and he was not otherwise there unlawfully, section 1165 was not violated. Thus, unless the Tribes possess regulatory authority by way of a delegation by the United States, Mr. Cassidy was not "unlawfully" fishing in the Reservation Zone.

At oral argument, the Government conceded that it could not prove a proper delegation of regulatory authority to the tribes. Consequently, Mr. Cassidy was not "unlawfully" fishing in violation of section 1165.

## III. CONCLUSION

The parties have agreed that resolution of the motions pending before this court will decide this matter. Having found that the Tribes are not "necessary" parties, and, therefore, not "indispensable" parties, the court rules as a matter of law against the Government's summary judgment motion, and for the Plaintiffs' implied cross-motion for summary judgment. There is no genuine issue of material fact remaining in this case since this proceeding turns on the legal interpretation of "paramount" in section 835d. "Paramount" does not mean "exclusive." Consequently, the general public is not precluded from the Indian portions of Roosevelt Lake. **IT IS HEREBY ORDERED:**

1. The Colville and Spokane Tribes do not have authority under the existing laws and regulations of the United States to regulate or prohibit fishing by non-Indians in any of the waters of Lake Roosevelt.

2. Fishing in all of the waters of Lake Roosevelt by non-Indians duly licensed by the State of Washington where such fishing activities are in compliance with the laws and regulations of the State of Washington is not and will not be in violation of 18 U.S.C. § 1165.

3. Joseph Cassidy's Renewal of Motion to Dismiss Information (Ct.Rec. 25, CR–92–194–JLQ) is **GRANTED.** The Superseding Information filed December 8, 1992 is hereby **DISMISSED WITH PREJUDICE.**

4. The Government's Motion to Dismiss for Failure to Join Indispensable Parties (Ct. Rec. 28, CS–93–19–JLQ) is **DENIED.**

5. The Government's Motion for Summary Judgment (Ct.Rec. 32, CS–93–19–JLQ) is **DENIED.** The Plaintiffs' implied cross-motion for summary judgment is **GRANTED.**

6. The Government's Motion to Clarify and Supplement Record (Ct.Rec. 57, CS–93–19–JLQ) is **DENIED AS MOOT.**

7. Plaintiffs' Motion to Strike and Expunge Portions of the Record or, in the Alternative, Motion to Compel Discovery (Ct.

Rec. 60, CS–93–19–JLQ) is **DENIED AS MOOT.**

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order; enter Judgment for Plaintiff; and close the file.