SOUTHEASTERN SHEET METAL JOINT APPRENTICESHIP TRAINING FUND, et al., Plaintiffs,

v.

Joseph BARSULI, Defendant.

No. 93–C–967.

United States District Court,
E.D. Wisconsin.

Jan. 15, 1997.

Matthew R. Robbins, Renata Dash, Previant, Goldberg, Ulemen, Gratz, Miller & Brueggeman, Milwaukee, WI, for Plaintiffs.

Gary M. Williams, Williams Law Offices, Hales Corners, WI, for Defendant.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on the parties' cross-motions for summary judg-

ment. For the following reasons, plaintiffs' motion for summary judgment is granted and the defendant's motion is denied.

## FACTS

Boiled down to its essentials, this case is basically a collection action. The National Training Fund for the Sheet Metal and Air Conditioning Industry ("the National Fund") is a multi-employer apprenticeship and training trust fund established pursuant to 29 U.S.C. § 1001 *et seq.* (Defendant's Proposed Findings of Fact ("DFOF") at ¶ 1; Plaintiff's Response to Defendant's Proposed Findings of Fact ("PR") at 1.) So too, the Southeastern Sheet Metal Joint Apprenticeship Training Fund ("the Local Fund") is a multi-employer apprenticeship and training fund established pursuant to 29 U.S.C. § 1001 *et seq.* (DFOF at ¶ 2; PR at 1.) The Local Fund operates in Kenosha, Racine and Walworth counties in the State of Wisconsin. (Id.) Marc De Jarlais ("Jarlais") is a fiduciary of the Local Fund. (Id.) A separate entity, called the Southeastern Sheet Metal Joint Apprenticeship Training Committee ("the Local Committee"), is a joint labor-management committee which is regulated by, and assists, the State of Wisconsin—Department of Industry, Labor and Human Relations—Bureau of Apprenticeship Standards ("DILHR–BAS") in the operation of sheet metal apprenticeship programs within Kenosha, Racine and Walworth counties. (DFOF at ¶ 3; PR at 1.) The Local Fund and the Local Committee share the same office in Racine, Wisconsin. (DFOF at ¶ 6; PR at 1.) They share the same equipment and the same files. (Id.) They employ the same individual, Lois Young, for secretarial assistance and they even use the same stationary and envelopes. (Id.) Nevertheless, while the National Fund, the Local Fund and Jarlais are party-plaintiffs in this action, the Local Committee *is not* a party to this action.

On or around October 29, 1986, Joseph Barsuli ("Barsuli") signed an Apprentice Indenture ("the Indenture") with the Local Committee. (Krawczyk Aff., Ex. G.) The Indenture committed Barsuli to a five-year apprenticeship in the Local Committee's Environmental Systems Technician Apprentice-

ship Program ("EST"). (DFOF at ¶ 10; PR at 1.) The EST apprenticeship is to be distinguished from the building trades Sheet Metal Apprenticeship Program ("SMA"), which is another apprenticeship program run by the Local Committee. (Jarlais Dep. at 12–13.) The EST program trains individuals in the servicing of air conditioning, heating and refrigeration units. (Id.) The SMA program trains individuals in the actual fabrication of sheet metal into various configurations. (Id.) Thus, SMA apprentices learn how to "set" heating and air conditioning units and form or install the ductwork, while EST apprentices learn how to subsequently run the wiring to such units, optically control the rooms they heat or cool, start the units up, and maintain or repair the units. (Id.) To this end, the EST program calls for certain specified hours of training in the areas of "Air Balance", "Start–Up and Certification of Comfort Systems", "Basic Installation—Heating and Cooling", "Maintenance & Warranties", "Equipment Connections to Energy Source", etc. (Krawczyk Aff., Ex. K.)

In accordance with federal and state regulations, the EST Indenture Barsuli signed was subsequently filed with, and approved by, DILHR–BAS. (DFOF at ¶ 12; PR at 1.) Also in accordance with federal regulations, the EST apprenticeship program in which Barsuli participated was properly "registered" with either the United States Department of Labor—Bureau of Apprenticeship and Training ("BAT") or DILHR–BAS. (DFOF at ¶ 13; PR at 1.) Subsequently, on or around March 3, 1987, Barsuli signed the first of five separate Sheet Metal Scholarship Loan Agreements ("SLA's"). (Krawczyk Aff., Ex. D.) The SLA's were not filed with any federal or state authority. (DFOF at ¶ 23; PR at 1.) The SLA's were virtually identical form documents pre-signed and supplied by the National Fund. (PR, ¶ 3 at 4; Defendant's Reply to Plaintiffs' Response to Defendant's Proposed Findings of Fact ("DRPR"), ¶ 3 at 9; Jarlais Dep. at 28.) Under the express terms of the SLA's, Barsuli warranted that he "understands and agrees that the Local Committee and the National Training Fund will expend significant sums of money for the training of [Barsuli] in the specialized skills necessary for

employment in the Sheet Metal Industry; ...." (Id.) Barsuli agreed, within each SLA, to a specific dollar value for these expenditures, itemized as "the cost of the training, including books, manuals, necessary equipment, instructors' salaries (where applicable) and related materials, ... [and] indirect and intangible value and worth". (Id.) He warranted that he "understands that these considerable expenditures will be repaid to the NTF and the Local Committee by [his] working in the Sheet Metal Industry resulting in contributions being made to the NTF and the Local Committee pursuant to Collective Bargaining Agreements." (Id.) Specifically, Barsuli would "receive a credit for each calendar year" he worked for a contributing employer, for a total of ten years, at which time the loan would be repaid "in-kind". (Id.) In this regard, Barsuli also agreed "that he ... will neither seek nor accept employment from an Employer engaged in, nor become an Employer engaged in, any general, mechanical sheet metal, testing and balancing, roofing, residential, sign or food service work or any other work covered by the Constitution of the Sheet Metal Workers' International Association unless such employment is performed under the terms of a collective bargaining agreement that provides for the payment of contributions by such Employer to the NTF or to the Local Committee...." (Id.) If Barsuli breached the agreement by accepting sheet metal work from a non-contributing employer, he agreed that "all amounts due and owing on the Scholarship Loan, reduced by any credit received by [Barsuli] ..., or by any cash payments made, will become immediately due and payable, together with inter-

est at the prime interest rate then prevailing at the Riggs National Bank in Washington, D.C., from the date of breach." (Id.) In addition, in the event of such a breach, Barsuli agreed that he "will be liable for all costs of collection, including reasonable attorneys' fees." (Id.)

Barsuli signed an SLA form for each of the five years of his apprenticeship.[1] (Id.) As preprinted forms supplied by the National Fund, each SLA referred to the National Fund and the Local *Committee* as the parties to the contract providing the loan to Barsuli. (Id.) The Local *Fund* is not referenced anywhere in the agreements. (Id.) Moreover, Lois Young, who is employed by both the Local Fund and the Local Committee, typed in the name of the Local Committee, not the Local Fund, under the "Notices" provision of each agreement, as that is the name called for by the preprinted form. (Id.; PR, ¶ 3 at 4; DRPR, ¶ 3 at 9.) The Local Fund maintains that this was essentially a clerical mistake and that it, and not the Local Committee, is the real party in interest to the contract, along with the National Fund. This explains why the Local Fund is a plaintiff in this action and the Local Committee is not. As support for its position, the Local Fund explains that in parts of the country other than Wisconsin, local training funds and local training committees are one and the same entity. (Krawczyk Aff., Ex. F at ¶ 7; Ex. N at ¶ 11.) This could explain why the Local Committee is listed as a party on a SLA form intended to be used across the country.[2] In Wisconsin, however, the Local Fund and the Local Committee are technically distinct entities, although they share common offices, common employees,

1. The amounts of each loan were as follows: January 1, 1987 through December 31, 1987— $1,848.16; January 1, 1988 through December 31, 1988—$3,086.52; January 1, 1989 through December 31, 1989—$3,235.64; January 1, 1990 through December 31, 1990—$1,253.60; January 1, 1991 through December 31, 1991— $1,358.76. (Krawczyk Aff., Ex. D.)

2. Barsuli questions whether this is true, but he provides no evidence to the contrary. He seizes upon deposition testimony where one of the sources of this information generally suggested, upon being asked, that the distinction between Wisconsin and other states might flow from differences in each state's laws, although he stated

he could not be sure what those differences were. (PR, ¶ 5 at 5; DRPR, ¶ 5 at 10–11; Krawczyk Aff., Ex. C at 60.) Barsuli argues that the proffered explanation is patently incorrect from a legal point of view because ERISA would preempt any state laws relating to the trust funds at issue. Whether Barsuli is correct or not, the deponent at issue was not a lawyer and was only offering a possible explanation for the distinction. At best, Barsuli raises a question as to what explains the distinction in this regard between Wisconsin and other states. He does not raise a factual dispute concerning whether or not the distinction exists.

common files and common equipment. (PR at ¶ 6 at 5.) As such, it is undisputed that any funds expended in connection with Barsuli's training were expended by the National Fund and the Local Fund. (PR, ¶ 9 at 5; DRPR, ¶ 9 at 12–13.) The Local Committee has no monetary assets and is therefore incapable of funding apprenticeship training. (PR, ¶ 7 at 5.) Indeed, the Local Fund is established and maintained for the express purpose of providing the Local Committee with funding when necessary to train apprentices. (PR, ¶ 6 at 5.)

Barsuli admits that he read the first of the five SLA's before signing it and that he understood its terms. (Krawczyk Aff., Ex. B ("Barsuli Dep.") at 81.) Specifically, he understood that the SLA's were designed "to keep me from using the training I was receiving under the apprenticeship program to work for non-union contractors in the geographic area within which [the Local Committee] operated the program—Racine, Kenosha and Walworth counties...." (Plaintiff's Proposed Findings of Fact ("PFOF") at ¶ 8; Defendant's Response to Plaintiff's Proposed Findings of Fact ("DR") at ¶ 8.) Barsuli did not read the subsequent SLA's because they were essentially the same as the first. (Barsuli Dep. at 84–88.)

Barsuli completed his apprenticeship on or around October 1, 1991. (DFOF at ¶ 26; PR at 1.) Towards the end of his apprenticeship and continuing thereafter, Barsuli worked in the sheet metal industry for a company called United Mechanical, which was a contributing employer. (Barsuli Dep. at 33–34, 37.) Sometime during the Fall of 1992, however, he was considering accepting employment with Abbott Laboratories, which is a non-contributing employer. (Barsuli Dep. at 113–16; Williams Supplemental Aff., Ex. A ("Jarlais Dep.") at 155–58.) He spoke with Jarlais about the job at Abbott after a union meeting. (Id.) Barsuli and Jarlais dispute the particulars of that conversation. Jarlais says Barsuli asked him whether there would be a problem with the Union or the Apprenticeship Program if he took the job with Abbott, to which Jarlais responded that, if the job fell within the jurisdiction of the sheet metal workers, Barsuli's SLA's would become due and payable. (Jarlais Dep. at 155–58.) Barsuli, on the other hand, claims that he and Jarlais never discussed the SLA's or what would happen if he worked for a non-contributing employer. (Barsuli Dep. at 113–16.) Rather, Barsuli said he was concerned about having to quit the Union in order to take the Abbott job, and about the repercussions that might have for him in the future if he did not like the job at Abbott and wanted to get back in the Union. (Id.) Barsuli claims that, in response, Jarlais told him he could simply fill out a withdrawal card, which would allow him to be an inactive member of the Union, and then if he was not happy at Abbott, he could come right back into the Union. (Id.)

In any event, Barsuli accepted the position with Abbott on November 6, 1992 and began working for the same on November 23rd. (PFOF at ¶ 27; DR at ¶ 27.) The title of his position is senior refrigeration mechanic. (Barsuli Dep. at 118.) Abbott lists the general duties of a senior refrigeration mechanic as follows:

● HVAC/Refrigeration Mechanic repair on air handling units, chillers, refrigerators.

● Test and balance environmental requirement testing.

● Installation, repair and calibration of pneumatic and electronic controls.

(Krawczyk Aff., Ex. R.) Additional duties, *inter alia*, are more specifically described as follows:

Performs all types of refrigeration maintenance work on a variety of equipment and systems including production and facility equipment....

Work includes troubleshooting, ordering parts and installation of parts and material on equipment such as chillers, lyophilizers, air conditioners, air handlers, compressors, pumps, etc.

    \*    \*    \*    \*    \*    \*

Installs bearings, seals, belts, gaskets, etc. utilizing a variety of gauges, tools and test equipment including vacuum and pressure gauges, leak detectors, halide torches, torque wrenches, multimeters, ammeters, welding equipment, etc.

Will perform vibration analysis and balancing functions on rotating equipment. Work may be on new equipment or rearrangement and/or retrofitting of existing equipment and accessories.

\* \* \* \* \* \*

In addition to work that may also be performed by STEP Refrigeration Mechanics and Refrigeration Mechanics, will work as a multi-skill tradesperson, doing electrical, pipefitting, building maintenance and/or other work on special assignments as required and assigned by the supervisor.

(Krawczyk Aff., Ex. S.) Consistent with the above, Barsuli's supervisors at Abbott generally refer to him as a Heating, Venting and Air Conditioning ("HVAC") repairman. (Baez Dep. at 10; Smith Dep. at 10–11.) They describe his duties variously as "maintain[ing] the HVAC equipment, chillers, refrigeration equipment, heating equipment, heating and ventilation" (Baez Dep. at 11), repairing roof-top air handler and air conditioning units (Baez Dep. at 11–12; Smith Dep. at 9–12), troubleshooting (Id.), repairing heating units (Id.), repairing or replacing controls on heating or air conditioning units (Smith Dep. at 11), etc.

Barsuli's work at Abbott is obviously very similar to the work he performed, and was trained to perform, as part of his apprenticeship. As stated earlier, the EST program trained individuals to service and maintain heating, air conditioning, and refrigeration equipment. Moreover, on his job application filed with Abbott, Barsuli stated that he was applying for a job as an "HVAC & R Technician"—*i.e.*, Heating, Ventilation, Air Conditioning and Refrigeration—and then described his former employment as falling within that category of work. (Krawczyk Aff., Ex. T.) For example, Barsuli described C & J Heating, with whom he worked from the beginning of his apprenticeship until 1988, as being in the "HVAC & R" business, and further stated that his duties were to "[s]ervice, [s]ell and [i]nstall HVAC & R equip." (Id.) Similarly, he described Korpela Heating, with whom he was an apprentice from February of 1988 until August of 1988, as being in the "HVAC & R" business, and again described his duties as "[s]ervice, [s]ell,

and [i]nstall HVAC & R equipment". (Id.) Finally, he described United Mechanical, with whom he finished his apprenticeship in 1991 and then continued working as a journeyman until 1992, as being in the business of "HVAC & R Service", and described his duties there as "[s]ervice and [i]nstall HVAC & R equipment—pipefitting—sheet metal— and electricity." (Id.) These claims in Barsuli's application are further supported by his deposition testimony. Therein, Barsuli states that during, and as part of, his apprenticeship, he learned how to rip out old furnaces and air conditioners and install new ones, install ductwork, install gas piping, conduct tests and start-up of furnaces and air conditioners, maintain, troubleshoot, repair and clean heating and air conditioning units—including rooftop units, check the air flow of such units, conduct air balancing, and perform welding and soldering in connection with the installation and maintenance of HVAC equipment. (Barsuli Dep. 17–154.) He basically handled "whatever would be considered the Sheet Metal industry, which would be air handlers.... Anything to do with air would basically be my concern." (Id.) His supervisors at Abbott sum up his current employment in much the same way, stating that Barsuli works on "[p]retty much anything in the heating, air conditioner, refrigeration field that has to do with heating or cooling." (Smith Dep. at 10.)

When the Local Committee learned that Barsuli accepted the job with Abbott, a noncontributing employer, Jarlais sent Barsuli a letter notifying him that his current employment breached the terms of his SLA's and demanding immediate payment of the remaining amounts due and owing, plus 10% interest calculated from the date of default. (Krawczyk Aff., Ex. O.) Jarlais calculated the amount due and owing, not counting interest or attorney's fees, as $5,641.91. (Id.) Barsuli refuses to pay. (PFOF at ¶ 32; DR at ¶ 32.) This lawsuit was filed to collect the amounts allegedly due and owing. Barsuli, in defense, alleges that the SLA's are void and unenforceable. He also counterclaims for breach of fiduciary duty.

## LAW

### I. SUMMARY JUDGMENT

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.*, at 327, 106 S.Ct. at 2555. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Company*, 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511. Nor may "[a] party to a lawsuit ... ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge, ....'" *Palucki*, 879 F.2d at 1572 (7th Cir.1989). Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.*, 786 F.Supp. 607, 610 (S.D.Miss.1992).

### II. APPLICATION

#### A. Failure to Join Local Committee as Party

Barsuli's first line of defense is a procedural one. Barsuli moves to dismiss

under Fed.R.Civ.P. 19(b) for failure to join an indispensable party. Barsuli argues that all of the SLA's list the Local Committee, not the Local Fund, as the third party to the contracts, and therefore the Local Committee is an indispensable party to this action.[3] Barsuli fails to favor the Court, however, with a Rule 19(b) analysis, except to state generally that "[j]oint obligees are ordinarily indispensable in an action to enforce rights under a contract." Rule 19 requires a stronger showing than that. Under Rule 19, "[t]he court employs a two-step analysis...." *Cassidy v. United States*, 875 F.Supp. 1438, 1443 (E.D.Wash.1994). "First, it must determine whether an absent party is 'necessary' to the suit." *Id.* "If so, and if that party cannot be joined, the court must assess whether the absentee party is 'indispensable' so that in 'equity and good conscience' the suit should be dismissed." *Id.* "The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application." *Id.* It "should not be based on formalistic or mechanistic grounds 'but rather on pragmatic analysis of the effect of a potential party's absence.'" *Johnson v. Chilkat Indian Village*, 457 F.Supp. 384, 387 (D.Alas.1978). "The moving party has the burden of persuasion in arguing for dismissal." *Cassidy*, 875 F.Supp. at 1443.

■ "[A] party is 'necessary' if complete relief cannot be granted among the existing parties or the absent party has a legally protected interest that might be impeded if the case proceeds in its absence." *Id.* Here, Barsuli makes no argument that complete relief cannot be granted among the existing parties. Nor would such appear to be the case. Regardless of whether the Local Committee or the Local Fund is the real co-party in interest, the National Fund is clearly a party in interest and can collect the amounts due and owing under the SLA's.[4] Barsuli

also makes no argument that, assuming the Local Committee is the true co-obligee under the SLA's, its interest as such would be impaired or impeded if the case were to proceed without it. "Impairment may be minimized if the absent party is adequately represented in the suit", *i.e.*, if there is another party in the suit with virtually identical interests who would be advancing virtually the same legal and factual positions. *Cassidy*, 875 F.Supp. at 1444. That is clearly the case here. Both the National Fund and the Local Fund seek to enforce the SLA's and to collect the amounts due thereunder. They both are diligently advancing the type of arguments necessary to achieve this end, and they are making strong arguments against the various defenses raised by Barsuli. Moreover, the Local Committee, which shares the same employees, office space, files and stationary as the Local Fund, is by that connection undoubtedly aware of this lawsuit. At no point has it attempted to intervene in the matter to protect any interest it may have or to show its concern that its interests are not being adequately represented. On these facts, the Court does not consider the Local Committee to be a "necessary" party.

■ Even if it did, however, the Court would not be persuaded to dismiss this suit. First, Barsuli makes no showing that the Local Committee cannot be joined to the lawsuit, a prerequisite to dismissal. At best, the Court could order that the Local Committee be joined as a party-plaintiff, but this is a form of relief Barsuli does not seek, presumably because it would remove from the case a procedural obstacle which Barsuli hopes to exploit to his advantage. Second, as indicated earlier, dismissal "must be guided by pragmatic considerations based on fairness." *Cohen v. Rosengarten*, 88 F.R.D. 568, 574 (E.D.Pa.1980). The Court should consider a variety of practical factors, including "(1)

---

3. The Court notes that Barsuli's briefs do not raise what might be considered a stronger argument, *i.e.*, that as a non-party to the SLA's the Local Fund lacks standing to pursue a claim against Barsuli. This is somewhat surprising, considering that Barsuli's answer reserved standing as an affirmative defense. Perhaps Barsuli passes on this argument because, even if successful, it only removes one plaintiff from the case and would not prevent the National Fund from

obtaining the very judgment which Barsuli hopes to avoid.

4. Of course, the National Fund could in turn be sued by either the Local Committee or the Local Fund—depending on which is determined to be the co-obligee under the SLA's—for their portion of the monies collected.

plaintiff's interest in having a forum; (2) defendants' interest in avoiding multiple litigation, inconsistent relief or sole responsibility for a liability shared with others (nonparties); (3) the interests of outsiders; and (4) the public interest in complete, efficient, and consistent settlement of controversies." *Id.*, citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109–11, 88 S.Ct. 733, 736–37, 19 L.Ed.2d 936 (1968). In this regard, "Rule 19 requires us to look beyond whether a non-party would technically be bound and to consider whether the judgment would 'as a practical matter' impair the non-party's interests." *Shell Oil Company v. Aetna Casualty and Surety Company*, 158 F.R.D. 395, 400 (N.D.Ill.1994). The Court is not to elevate form over substance:

> The decision whether to dismiss (i.e., the decision whether the person missing is "indispensable") must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests. Rule 19 does not prevent the assertion of compelling substantive interests; it merely commands the courts to examine each controversy to make certain that the interests really exist. To say that a court "must" dismiss in the absence of an indispensable party and that it "cannot proceed" without him puts the matter the wrong way around: a court does not know whether a particular person is "indispensable" until it has examined the situation to determine whether it can proceed without him.

*Cohen*, 88 F.R.D. at 574–75, quoting *Provident*, 390 U.S. at 118–19, 88 S.Ct. at 742. Here, it is undisputed that the Local Committee expended no funds in connection with Barsuli's apprenticeship. Rather, it was the Local Fund which expended the monies at issue. The only evidence is that the name of the Local Committee was inserted on each SLA because the pre-printed form called for it. In this regard, the form mistakenly failed to take into consideration the fact that, in Wisconsin, the Local Committee and the Local Fund are technically distinct entities, and it is the Local Fund which expends the funds at issue. To the extent this mistake creates

a technical legal interest in favor of the Local Committee, it is not one which merits much consideration in connection with a Rule 19 analysis. One is hard-pressed to say that the Local Committee's interests will be prejudiced if the case goes forward, given that the Local Committee did not advance any of the funds at issue and, as a practical matter, has little at stake here. Moreover, given the symbiotic nature of the Local Fund and the Local Committee, there is little risk that Barsuli will face multiple lawsuits stemming from his breach of the SLA's. Though technically distinct entities, it is quite clear that the Local Fund and the Local Committee are involved in a common enterprise, and that as part of that enterprise they are enforcing Barsuli's obligations under the SLA's by virtue of this lawsuit. If the Local Committee had any intention of pursuing a separate claim in its own name relating to Barsuli's SLA's, one would expect it to have done so within the context of this suit. Finally, the public's interest in the efficient resolution of controversies would not be served by dismissing the action at this point, simply to have it refiled in the name of another party who, for all practical purposes, has little to no stake in the litigation. Therefore, the Court denies Barsuli's request to dismiss the case for failure to join a necessary party.

### B. Enforceability of the SLA's

#### 1. "Registration" of the SLA's.

■ Barsuli argues that the loan agreements are unenforceable because they were not "registered" with state or federal authorities. He relies in this regard upon 29 C.F.R. § 29.3(c), which provides that "apprentices must be individually registered under a registered program". Such registration can be accomplished "[b]y filing copies of each apprenticeship agreement" with either the federal department of labor or with a recognized state agency. Here, Barsuli's Indenture was "registered" with Wisconsin's DILHR–BAS, a recognized state agency. However, his SLA's were not so registered, and Barsuli claims they should also be considered "apprenticeship agreement[s]" subject to registration under the federal regulations.

The Court disagrees. The federal regulations at issue were issued pursuant to the Fitzgerald Act, which authorized the development of federal regulations governing apprenticeship programs. *See,* 29 U.S.C. § 50 *et seq.* At the time the regulations were issued, the use of SLA's was a relatively unknown practice. Such agreements first developed in the 1980's. They were intended to address the problem of apprentices working for non-contributing employers soon after contributing employers had paid for their training via the National and Local Funds. Not surprisingly, nothing in the statute or in the implementing regulations explicitly discusses SLA's. Nonetheless, Barsuli asks the Court to interpret the regulations as requiring the registration of such agreements with the federal or state agencies responsible for apprenticeship programs. The Court hesitates to create another layer of bureaucracy to an already regulated industry absent some clear indication from the federal government, via the Department of Labor, that such is its intention.

There is textual and evidentiary support for such hesitancy. First, the federal regulations list what must be contained in an "apprenticeship agreement", *see,* 29 C.F.R. § 29.6, and that list does not include a requirement that such agreements must delineate or determine who will bear the costs of the apprenticeship and how. Thus, one could argue that agreements related to such costs fall outside the scope of the "apprenticeship agreement" required to be registered under the federal regulations. Second, the Department of Labor itself seems to consider such agreements to be outside of the regulations. In connection with reviewing preliminary drafts of a master SLA, the Department of Labor—Bureau of Apprenticeship and Training ("BAT") issued two circulars which concluded that there were no legal problems with the use of SLA's under either the Fitzgerald Act or the implementing regulations. (Krawczyk Aff., Ex. L, App. F.) More importantly, BAT stated that "such supplemental agreements are *separate and apart from [the] apprenticeship standards.* The Bureau of Apprenticeship and Training recommends that sponsors contemplating the use of similar supplementary agreements consult with their attorneys prior to developing such an agreement." (Id.; emphasis supplied.) Such language suggests that BAT considers SLA's to fall outside the federal regulations governing apprenticeship programs, including the regulations requiring the registration of "apprenticeship agreements". If it was BAT's position that such agreements had to be registered in order to be enforceable, one would have expected it to. say so in the context of these two circulars. Wisconsin's DILHR–BAS seems to take the same approach with regard to any state regulations at issue. (*See,* Response of Department of Industry, Labor and Human Relations to motion to Compel Joinder at 1–2) ("Nowhere in ch. 106 did the Legislature prescribe to the Department any power, duty or responsibility related to scholarship loans or similar arrangements between the employer and the apprentice.... Accordingly, the Department has no role to play in the contractual/loan dispute between the plaintiffs and the defendant in this action.") Indeed, BAT seems to caution employers to consult with their own attorneys regarding the validity of SLA's precisely because federal and state agencies do not regulate such agreements. All of the foregoing militates against an interpretation of the regulations which would require each individual SLA to be "registered" with the federal or state authorities in order to be enforceable.

**2. SLA's conflict with the Indenture.**

Barsuli next argues that the SLA's conflict with his Indenture and that the Indenture should control. The supposed "conflict" between these agreements is wholly manufactured. Barsuli focuses on language in the Indenture which states that the Local Committee agreed to employ Barsuli as an apprentice "upon the terms and conditions in this indenture." (Barsuli's Brief in Support at 8.) He also relies on language stating that "[t]he provisions binding on the parties hereto as to probationary period, school attendance, hours of employment, processes, wages and the methods or plans of instruction are contained in exhibit "A" which said exhibit is made a part hereof." (Id.) Because nothing in the Indenture or in exhibit A created or discussed a financial obligation on Barsuli's

part, Barsuli argues that the SLA's attempt to do so "conflicts" with the terms and conditions of his Indenture. Not so. The Indenture simply did not address the issue of financing. Nothing in the Indenture prevented the parties from executing side agreements concerning the same. As described in the Indenture itself, exhibit A was limited to detailing Barsuli's "probationary period, school attendance, hours of employment, processes, wages and the methods or plans of instruction". Financing was not an issue addressed by exhibit A or any other provision of the Indenture. Therefore, rather than conflicting with Barsuli's Indenture, the SLA's merely supplement the same.

### 3. Breach of fiduciary duty.

Finally, Barsuli argues that the SLA's are unenforceable because Jarlais, as an administrator of the apprenticeship program, breached his fiduciary duties imposed by the Employee Retirement Income Security Act ("ERISA"). Specifically, he claims Jarlais had a fiduciary duty to tell him, during their conversation following the union meeting, that his potential employment with Abbott could place him in breach of his SLA's. He asserts this alleged breach both as an affirmative defense and as a counterclaim.

■■■ First, apprenticeship programs such as the one involved here are welfare benefit plans governed by ERISA. *See generally, National Training Fund for the Sheet Metal and Air Conditioning Industry v. Maddux,* 751 F.Supp. 120, 121 (S.D.Tex. 1990). Second, administrators of such plans (assuming, for the sake of argument, that Jarlais is an administrator), can be sued by "participants" or "beneficiaries" of the plans for breach of their fiduciary duties to said participants and beneficiaries. There is no dispute as to these two preliminary points. The parties dispute, however, whether Barsuli qualified as a "beneficiary" or "participant" of the Plan at the time of the alleged breach, and whether the facts, construed in the light most favorable to Barsuli, could support a finding that a breach actually occurred.

The first dispute is interesting. It is generally held that the term "participant" is statutorily defined as "any employee or former employee ... who is or may become eligible to receive a benefit...." 29 U.S.C. § 1002(7); *see also, Sallee v. Rexnord Corporation,* 985 F.2d 927, 928 (7th Cir.1993). The Supreme Court construes this definition to cover "either employees in, or reasonably expected to be in, currently covered employment, or former employees who have ... a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits." *Sallee,* 985 F.2d at 928–29, quoting *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 117–18, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989). Here, at the time of Barsuli's conversation with Jarlais concerning his potential employment with Abbott, Barsuli had already completed the apprenticeship program and was a certified journeyman. He was no longer receiving benefits from the apprenticeship program ("the Plan") and could no longer receive such benefits. Thus, plaintiffs argue, he does not have standing to pursue a fiduciary duty claim, a conclusion readily supported by the case law. Barsuli argues, however, that while he had no remaining *right to benefits* under the Plan, he still had *obligations* under the Plan, and that administrators of the Plan had a fiduciary duty to Barsuli in connection with the enforcement of those obligations. This aspect of the case does distinguish it from the case law cited by the plaintiffs, but to what end the Court need not decide. That is because, even assuming such a fiduciary duty existed here, there is no genuine dispute of fact concerning whether or not it was breached.

■■■ The Court must view the facts in the light most favorable to Barsuli. There are two versions of Barsuli's conversation with Jarlais. Jarlais claims he told Barsuli that employment with Abbott could trigger the repayment of his SLA's. Obviously, under that version of events, Barsuli loses. Barsuli claims, however, that he and Jarlais never discussed the SLA's and that he never asked Jarlais what impact his job with Abbott might have in connection with those agreements. Barsuli insists that his only concern at the time, and his only question to Jarlais, was whether he would have to quit

the Union to take the Abbott job and, if so, what repercussions that might have down the road if he did not like the job at Abbott and wanted to get back in the Union. Under that version of events, Barsuli still loses. Jarlais cannot be expected to be a mind reader. Of course, "ERISA imposes a duty upon fiduciaries to respond promptly and adequately to employee-initiated inquiries regarding the plan or any of its terms." *Electro–Mechanical Corp. v. Ogan,* 9 F.3d 445, 451 (6th Cir.1993). However, "[a]bsent a specific employee-initiated inquiry, a fiduciary is not obligated to seek out employees to ensure that they understand the plan's provisions as described in the explanatory booklet." *Id.* at 452. Put another way, "absent a specific participant-initiated inquiry, a plan administrator does not have any fiduciary duty to determine whether confusion about a plan term or condition exists. It is only after the plan administrator does receive an inquiry that it has a fiduciary obligation to respond promptly and adequately in a way that is not misleading." *Jordan v. Federal Express Corporation,* 914 F.Supp. 1180, 1192 (W.D.Pa.1996). Here, under Barsuli's version of events, which is the most favorable version from his perspective, Barsuli made no specific inquiry regarding his SLA's and the impact his job with Abbott might have on the same. He only asked Jarlais how his potential new job would affect his current and future membership in the Union, and Jarlais answered that question promptly and adequately. Jarlais was not under an affirmative duty to further find out whether Barsuli remembered and understood the terms of his SLA's and had contemplated the possibility that his new job would conflict with the same.

The Court also questions how Barsuli intends to show reliance upon Jarlais' alleged silence. Barsuli admits that, when he signed his first SLA, he understood its terms and understood that it was designed to prevent him from working for non-contributing employers. Having that understanding, he cannot credibly claim to have relied upon Jarlais' silence in response to a question that was never asked. Under his own version of the facts, the only express information Barsuli had prior to accepting employment with Abbott was what he learned from reading that first SLA. Absent an express statement from Jarlais to the contrary, or Jarlais' silence in response to a direct and specific question from Barsuli regarding the impact his employment with Abbott would have on his SLA's, the Court fails to see how Barsuli can show that he reasonably relied upon anything Jarlais said or failed to say.

## C. Breach of the SLA's

Having dispensed with the defenses argued by Barsuli in his motion papers, the Court must still determine whether the SLA's were indeed breached in the manner suggested by the plaintiffs. It is clear that, prior to repaying what was owed under the SLA's, Barsuli accepted a job with Abbott, a non-contributing employer. Barsuli disputes, however, albeit tepidly, whether the work he performs at Abbott falls within the category of the Sheet Metal Industry as defined in the SLA's. (PFOF at ¶ 27; DR at ¶ 27.) To be precise, the SLA's oblige Barsuli not to work for any non-contributing employer engaged in "any general, mechanical sheet metal, testing and balancing, roofing, residential, sign or food service work or any other work covered by the Constitution of the Sheet Metal Workers' International Association...." (Krawczyk Aff., Ex. H.) In answering the question as to whether Barsuli's current job falls within the categories covered by the Sheet Metal Worker's union, one need only look at the collective bargaining agreements which the Union signed during the years in which Barsuli was an apprentice and journeyman. The type of work covered by those agreements includes "the (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof *and of all air-veyor systems and air handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith;* (b) all lagging over insulation and all duct lining; (c) *testing and balancing of all air-handling equipment and duct work;* ...." (Krawczyk Aff., Exs I & J at 1;

emphasis supplied.) As discussed in the facts of this case, Barsuli's current job includes, *inter alia*, the adjustment, alteration, repair, servicing, and testing and balancing of refrigeration and air handling systems. Moreover, the EST program which Barsuli participated in specifically trained individuals in the service and maintenance of heating, air conditioning, and refrigeration equipment, which are the very duties which Barsuli's own supervisors at Abbott list to describe his current position. Finally, in order to get the Abbott job, Barsuli submitted an application which described his duties and training as an apprentice and journeyman as involving "HVAC & R" installation and service, the very type of work he was seeking with Abbott. For Barsuli to now argue, in the face of this record, that somehow the work he performs at Abbott falls outside the scope of his apprenticeship and outside the scope of the Sheet Metal Industry borders on the frivolous.

Having found that Barsuli's work at Abbott falls within the scope of his SLA's, it follows that Barsuli has breached those agreements. Plaintiffs calculate the amount due and owing as $5,641.91, not counting interest and attorney's fees. Barsuli submits nothing to challenge the specifics of this calculation. It is therefore accepted by the Court. Under the SLA's, plaintiffs are also entitled to prejudgment interest "at the prime interest rate then prevailing at the Riggs National Bank in Washington, D.C., from the date of breach", as well as "all costs of collection, including reasonable attorneys' fees." The Court will order the plaintiffs to supplement the record herein with a calculation of the interest earned to date and an itemization, supported by the relevant invoices and/or timesheets, of their attorney's fees. Barsuli will have an opportunity to contest these calculations.

■ As a final matter, the Court should probably address the issue concerning whose name(s) the judgment(s) shall be in. Obviously, the National Fund is entitled to a judgment in its name as an undisputed party to the SLA's. Moreover, the Court believes separate judgments for the National Fund and its co-obligee are preferable considering that the SLA's each state that the monies at issue shall be paid to each obligee "in the same proportions as [they] have contributed direct funds to the Loan as set forth in paragraph 1 herein." (Krawczyk Aff., Ex. H.) Given that the Local Fund is not an express party to the SLA's, it is unclear on what procedural basis the Court can enter a judgment thereunder in its favor, regardless of whether Barsuli has waived a standing argument. (See footnote 3, *supra*.) In *Ashland–Warren, Inc. v. Sanford*, 497 F.Supp. 374 (M.D.Alab.1980), the Court was faced with an analogous situation. There, an outdated form contract was used in a construction transaction. The outdated form mistakenly referred to one of the contracting parties, "Sam Finley Company", as a division of "Ashland Oil, Incorporated". In reality, "Sam Finley" was now a tradename owned by "Ashland–Warren, Incorporated", a different entity from Ashland Oil, Incorporated. The Court stated that the "mistake placed Ashland–Warren, Incorporated in the position of an undisclosed principal." *Id.* at 377. As an undisclosed principal, Ashland–Warren could sue on the contract as the real party in interest:

> ... the rule seems to be universally accepted that, where an agent on behalf of his principal, enters into a simple contract as though made for himself, and the existence of the principal is not disclosed, the contract inures to the benefit of the principal, who may sue thereon as the real party in interest.

*Id.*, quoting *Maples v. Morring*, 207 Ala. 352, 92 So. 470 (1922). The record before the Court clearly indicates that a similar mistake was made here. The parties used a form contract provided by the National Fund which mistakenly failed to take into consideration the technical distinction—somewhat peculiar to Wisconsin—between the Local Fund and the Local Committee, and as a result mistakenly failed to list the Local Fund as a co-obligee under the SLA's. That this was an honest mistake is further supported by the undisputed fact that the Local Committee expended no funds in connection with Barsuli's apprenticeship, leaving no logical basis for including the Local Committee as a party to such an agreement. Under such

circumstances, the Court should have the discretion to recognize the practical realities of the situation and declare the Local Fund to be a co-obligee under the SLA's, either·as an undisclosed principal, the real party in interest, or both. Therefore, the Court will enter separate judgments in favor of the National Fund and the Local Fund. As part of their calculations with respect to interest and attorney's fees, the Court will order the plaintiffs to calculate the amount of each judgment according to the proportions called for in the SLA's. The Court will provide Barsuli an opportunity to contest these calculations as well.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Defendant's motion for partial summary judgment is denied;

2. Plaintiffs' motion for summary judgment is granted;

3. Defendant's counterclaim is dismissed; and

4. Plaintiffs shall supplement the record with the calculations and evidence called for above on or before January 22, 1997. Barsuli shall submit any objection to these calculations on or before January 29, 1997. The Court will issue formal judgments shortly thereafter.

SO ORDERED.